**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cr-00142** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **[1] JULIUS JOHNSON** | ) | |
| **[2] AMBER JOHNSON** | ) | |
| **[3] ELDRED HOWARD** | ) | |

## <u>MEMORANDUM</u>

Before the court is the Motion to Suppress Evidence Obtained Pursuant to Unlawful Wiretap (TT4) (Doc. No. 164), filed by defendants Julius Johnson, Amber Johnson, and Eldred Howard ("moving defendants"). For the reasons set forth herein, the motion will be denied.

## I.    BACKGROUND

On September 25, 2023, the grand jury returned a ten-count Indictment charging the moving defendants, along with three other individuals (David Marsh, Antonio Jumper, and Archie Leniel Henry), with conspiring to knowingly and intentionally distribute and to possess with intent to distribute controlled substances and knowingly and intentionally using a communication facility (a cellular telephone) to commit a felony, along with additional drug and weapon charges. Trial on these charges is currently set for April 1, 2025. (Doc. No. 106.)

Much of the evidence that led to the Indictment was obtained through the use of four different wiretaps to intercept communications made on four target cellular telephones used by four of the defendants, David Marsh, Antonio Jumper, Archie Henry, and Julius Johnson. The first wiretap application sought in the course of the investigation into the conspiracy alleged in this case was filed in November 2022. As set forth in the November 28, 2022 Affidavit of FBI Agent Robert

Barrett ("November 2022 Affidavit") submitted in support of the wiretap application for Target Telephone 1 ("TT1") for a cellular telephone used by defendant Marsh, investigation by law enforcement officers with various agencies working together had "revealed that a group of 5-Deuce Hoover Crips street gang members from in and around the Cumberland View housing projects, known as 'Dodge City,' located in North Nashville, Tennessee," was involved in distributing controlled substances in that area. (Doc. No. 184-1 at 23.) Information obtained from a reliable confidential human source ("CHS-1") indicated that Marsh was involved in the street gang, and, as set forth in the November 2022 Affidavit, law enforcement officers reasonably believed that Marsh was using TT1 to distribute cocaine. (*Id.* at 25.) Then-Chief Judge Waverly Crenshaw issued an Order granting the government's Application for a wiretap on TT1. *See* Order, *In Re Cellular Telephone Assigned Number (615) 810-7821*, No. 3:22-sm-00007 (SEALED) (hereinafter, "*In Re No. (615) 810-7821*"), (M.D. Tenn. Nov. 28, 2022), ECF No. 2. In January 2023, based on communications intercepted over TT1, Judge Crenshaw authorized renewal of the wiretap on TT1 and a wiretap on another telephone (Target Telephone 2, "TT2") believed to be used by defendant Antonio Jumper, one of Marsh's associates. *See* Application and Order, *In Re No. (615) 810-7821* (M.D. Tenn. Jan. 12, 2023), ECF Nos. 7, 8. On February 16, 2023, Judge Crenshaw authorized the renewal of the wiretap on TT2 and a wiretap on a third telephone ("TT3"), then believed to be used by Antonio Jumper but found through the wiretap interceptions to be used by defendant Archie Henry. *See* Application and Order, *In Re No. (615) 810-7821* (M.D. Tenn. Feb. 16, 2023), ECF Nos. 14, 15.

According to the March 10, 2023 Amended Affidavit of Robert Barrett ( "Barrett Aff." or "Barrett Affidavit") submitted in support of the application for the wiretap on Target Telephone 4 ("TT4"), the previous wiretaps revealed that an individual known as "Ju" or "Juju" was supplying

Marsh, Henry, and others with drugs that were then distributed around the Cumberland View housing projects. *See* Barrett Aff. ¶¶ 23–28, *In Re No.(615) 810-7821* (M.D. Tenn. Mar. 10, 2023), ECF No. 23-2 (filed in this case at Doc. No. 164-1 at 21–61). And law enforcement officers eventually confirmed that "Ju" was defendant Julius Johnson. (Barrett Aff. ¶ 23 & n.4.) In March 2023, law enforcement sought authorization to intercept TT4, a telephone linked to and believed to be used by defendant Julius Johnson. (*See* Doc. No. 164-1.) On March 8, 2023, Judge Crenshaw signed an initial Order authorizing the initial interception of TT4 for a period of thirty days. (Doc. No. 164-2 at 1–11.) He entered a supplemental Order on March 10, 2023, on the government's oral motion, updating the International Mobile Subscriber Identity ("IMSI") number and the subscriber address on the application, as reflected in the government's Amended Application sworn out on March 10, 2023. (Doc. No. 164-2 at 12–13.) On April 7, 2023, Judge Crenshaw entered an Order extending the period of interception on TT4 for an additional thirty days. (Doc. No. 184-4.)

On April 13, 2023, after the original authorization had expired but while the extended period was ongoing, the government filed an Application to Seal Wire and Electronic Communications to and from Target Telephone 4, specifically requesting to seal two discs containing recorded interceptions of communications to and from TT4 occurring between March 10, 2023 and April 8, 2023. Application, *In Re No. (615) 810-7821* (M.D. Tenn. April 13, 2023), ECF No. 35. Judge Crenshaw granted the Application the same day. Order, *In Re No. (615) 810-7821* (M.D. Tenn. April 13, 2023), ECF No. 36.

On May 2, 2023, before the second authorization Order expired, the government submitted a second Application to Seal Wire and Electronic Communications to and from Target Telephone 4, seeking to seal one disc of recorded intercepted calls on TT4 that had taken place between April

7, 2023 and April 25, 2023. Application, *In Re No. (615) 810-7821* (M.D. Tenn. May 2, 2023), ECF No. 38. In this Application, the government notified the court that law enforcement agents had "ceased interceptions prior to the end of the 30-day period because Johnson stopped placing outgoing calls on Target Telephone 4, leading agents to believe that Johnson was no longer using the phone. *Id.* at 2. The Application also explained that, although interceptions ceased on April 25, 2023, the recorded communications were not "burned to a disc" until May 1, 2023, because DEA Special Agent Timothy Finney, who was apparently responsible for monitoring the interceptions, was "out of the office traveling for work the week of April 24, 2023, and was thus unable to receive the disc and make it available to the Court for sealing." *Id.* at 2–3. Judge Crenshaw granted that Application as well. Order, *In Re No. (615) 810-7821* (M.D. Tenn. May 4, 2023), ECF No. 40.

Based on information obtained from the wiretaps and other investigative efforts, law enforcement officers obtained warrants to search multiple locations where the government believed Johnson was storing drugs and drug proceeds, which ultimately led to the Indictment charging the defendants on various drug and weapons charges.

In the present Motion to Suppress, the moving defendants challenge the wiretap on TT4. The defendants assert that (1) the affidavit submitted in support of the application for the initial interception of TT4 failed to establish probable cause that Julius Johnson was committing or was about to commit alleged drug crimes; (2) any probable cause determination was based on stale information; (3) the wiretap application failed to meet the necessity requirement set forth in 18 U.S.C. § 2518(1)(c) and (3)(c); (4) material omissions from the "necessity" section of the affidavit entitle the defendants to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) (a so-called "*Franks* hearing"); and (5) the government failed to seal the recordings of the calls intercepted from TT4 in a timely fashion, as required by 18 U.S.C. § 2518(8)(a). (*See generally* Doc. No. 164.)

The government argues in its Response (Doc. No. 182) that the wiretap application was supported by probable cause and satisfied the necessity requirements set forth in § 2518. Alternatively, it argues that the reviewing judge had a substantial basis for finding probable cause and necessity. The government also argues that the facts establishing probable cause were not too remote in time to be relied upon because the facts provided evidence of ongoing criminal activity, and it contends that the moving defendants are not entitled to a *Franks* hearing because they have failed to identify any false statements in, or material omissions from, the Barrett Affidavit or to show that any such false statements or omissions were critical to the probable cause finding. Finally, it contends that the recordings of the communications intercepted from TT4 were sealed in accordance with § 2518(8)(a), and, even if they had not been, the moving defendants have not shown that suppression would be the appropriate remedy. The moving defendants' Reply (Doc. No. 190) largely presses points already made in support of their motion.

## II.     TITLE III

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–22, "sets forth specific procedural requirements that must be followed before the government will be allowed to intercept the private conversations of citizens." *United States v. Gray*, 521 F.3d 514, 521 (6th Cir. 2008). Section 2518 governs applications for wiretaps to intercept telephone communications. It generally requires that an application for an order approving a wiretap be made "in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application." *Id.* § 2518(1). A judge may grant the application by entering an *ex parte* order approving the wiretap upon a finding that the facts presented by the applicant establish probable cause to believe both that the targeted individual "is committing, has committed, or is about to commit a particular offense" and that "particular communications concerning that offense will be obtained through such interception." *Id.* § 2518(3)(a)–(b). In

addition, the judge must be satisfied that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c). "This is referred to as the 'necessity requirement.'" *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (citation omitted).

If a wiretap application is granted, "[a]ny aggrieved person" may move to suppress any "unlawfully intercepted" communication in a hearing before a court of law. *Id.* § 2518(10)(a). *United States v. Asker*, 676 F. App'x 447, 454 (6th Cir. 2017). The term "aggrieved person" is defined as a "person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed. *Id.* § 2510(11).[1] A motion to suppress may be premised on any one of three grounds: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(i)–(iii). Both probable cause and necessity are requirements without which an interception is unlawful. *Accord Lambert*, 771 F.2d 83, 91, 92 (6th Cir. 1985) (rejecting claim that wiretap was illegal because the affidavit failed to establish probable cause or necessity).

---

[1] Although the moving defendants devote a substantial portion of their Reply to the issue of standing (*see* Doc. No. 190 at 1–2), the government does not dispute that all three moving defendants "were in fact intercepted over Target Telephone 4" and therefore does not actually contest their standing to bring the Motion to Suppress (Doc. No. 182 at 4–5 n.1). The court notes, however, that the Sixth Circuit has stated that, when the movant is not "a "person against whom the interception was directed," 18 U.S.C. § 2510(11), but instead bases standing on having been "a party to" one or more of the intercepted communications, such a party has standing to challenge only the admission into evidence of the particular communications in which they were personally intercepted. *See Asker*, 676 F. App'x at 455 ("[W]iretap searches are subject to the same 'established principle' that governs alleged Fourth Amendment violations: 'suppression of the product of a [violative search] can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.' As such, . . . Asker has standing 'only with reference to the interceptions of the telephone conversations . . . in which [Asker] participated." (quoting *United States v. Cooper*, 868 F.2d 1505, 1509–10 (6th Cir. 1989)) (alterations in original).

A defendant seeking suppression of evidence generally bears the burdens of production and persuasion. *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014) (citing *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998); *United States v. Giacolone*, 853 F.2d 470, 482 (6th Cir. 1988)). In considering the motion, the court must view the evidence "in the light most favorable to the government," *id.* (citing *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)), and presume the validity of the wiretap order, giving "great deference to the determinations of the issuing judge." *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007) (quoting *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000)). However, the good-faith exception does not apply to wiretap orders. *Id.* at 711.

## III.    DISCUSSION

In the background sections of the Barrett Affidavit attached to the government's Application for the TT4 wiretap, FBI Agent Robert Barrett attests that: (1) he has training and experience in gang and controlled substances investigations; (2) he has experience using numerous investigative techniques in pursuing these investigations; (3) he is the co-case agent investigating the drug trafficking organization ("DTO") in which the defendants are alleged participants, with the investigation being conducted in partnership with the FBI, the Metro Nashville Police Department ("MNDPD"), and other local, state, and federal law enforcement officers ("Agents"); (4) Agents have probable cause to believe that Johnson was using TT4 in connection with commission of the drug offenses ("Target Offenses") identified in the Affidavit; (5) intercepted communications were expected to concern the Target Offenses and to identify and provide admissible evidence regarding the Target Offenses; the names and identifying information of individuals involved in the DTO and others; the dates, times and places for the commission of drug trafficking activities; the nature, scope, places, and methods of operation; and the existence and location of records documenting drug trafficking activities; (6) normal investigative procedures

had been tried and had "failed, appear unlikely to succeed if tried, or are too dangerous to employ"; and (6) in addition to those "Target Subjects" identified in prior affidavits submitted in support of the wiretaps for TT1, TT2, and TT3 (including David Marsh and Antonio Jumper, among others), both Julius Johnson (who has seven prior felony convictions since 2002, six of which are drug-related) and Archie Henry (who has four prior felony convictions, two of which are drug-related, and who was believed to be the user of TT3) had been identified as additional "Target Subjects" since February 16, 2023. (Barrett Aff. ¶¶ 2–4, 10–12, 21.)

### A. Probable Cause

The facts alleged by Barrett in support of probable cause to support the TT4 wiretap application include the following:

(1) As detailed in prior affidavits submitted in support of the TT1, TT2, and TT3 wiretap applications, law enforcement investigation had "revealed that a group of 5-Deuce Hoover Crips street gang members is distributing cocaine, marijuana, diverted prescription pills, and other controlled substances in and around the Cumberland View housing projects." (Barrett Aff. ¶ 22.)

(2) From the TT1 wiretap on David Marsh's telephone, which began on November 28, 2022, Agents had identified Antonio Jumper as a close associate of Marsh. From the TT1 wiretap and the TT2 wiretap on Jumper's telephone, which began on January 12, 2023, Agents learned that Marsh and Jumper frequently conducted drug-trafficking activity together and distributed controlled substances to "some of the same lower-level distributors within their drug trafficking organization ('DTO')." (*Id.* ¶ 23.)

(3) From the TT3 wiretap, Agents had learned that Archie Henry was the user (although not the subscriber) of TT3 and was believed to be a mid-level distributor of controlled substances who worked for Jumper and others. (*Id.* ¶ 21(b).)

(4) Agents were also able to identify Julius Johnson, also known as "Ju" or "Juju," as another member of the DTO and "a possible source of supply" of various controlled substances to Marsh, Jumper, and Archie Henry. (*Id.* ¶ 23 & n.4.)

(5) More specifically, Agents intercepted a call on TT1 on December 6, 2022 during which Marsh told an unidentified caller that he "had some loud" from "Ju," which he would sell to the caller for "1200 a pound" or "75 an ounce." (*Id.* ¶ 24.)

(6) Barrett testified that he believed, based on his training, experience, and knowledge of the investigation, that Marsh was telling the unidentified caller that he had been supplied a large quantity of marijuana ("loud") from Julius Johnson, which he was offering to sell to the caller for $1,200 per pound or $75 per ounce. (*Id.* ¶ 25.)

(7) During a call intercepted from TT1 on January 24, 2023, Marsh told an unidentified male ("UM-7001") that he owed Archie a hundred dollars. UM-7001 responded, "Who? Fuck Archie, he gave me some cut . . . . Tell'm tell'm file a claim with the Better Business Bureau [laughs]. . . . That's why I ain't gave no [unintelligible] gave me a bag of cut some of Ju's shit that was cut up. . . . I would never even spend a bus token with him again." But then UM-7001 asked Marsh, "What's up with you? You out your way?" Marsh replied, "Uh huh, right here out north," and UM-7001 told him he "might need to grab like a little half or something, you got some girl, some soft? Just to hold me off with Big, Big Ju's post to be back here in a few hours, I just talked to him." (*Id.* ¶ 26.)

(8) Based on his training, experience, and knowledge of the investigation Barrett interpreted this conversation to mean that Marsh called UM-7001 to ask about drug proceeds UM-7001 owed Archie Henry; UM-7001 responded that he did not want to pay Henry because Henry had supplied him with low quality or diluted drugs ("a bag of cut") that he received from Henry but that had originally come from Johnson ("Ju's shit that was cut up"); and UM-7001 wanted to buy some cocaine ("some girl, some soft") from Marsh to hold him over until Johnson ("Big Ju") returned with more cocaine. (*Id.* ¶ 27.)

(9) On another call intercepted from TT1 on January 24, 2023, Marsh received an incoming call from TT4, a cellular telephone subscribed to Johnson, during which Johnson asked Marsh, "What are you doing?" and Marsh replied, "Nothing, by my auntie . . . Jackie.[2] I [unintelligible] some for you, too." Johnson asked if Marsh had "anything on Cash App," Marsh responded that he did not, and Johnson asked, "Man . . . ain't nobody with you?" Marsh said he was "right here talking to my auntie Jackie . . . . I'm in the projects." Johnson replied, "Okay, I was trying to get . . . trying to get some [unintelligible]. Oh, all right." And Marsh said, "All right." (*Id.* ¶¶ 28–29.)

(10) Again based on his training, experience, and knowledge of this investigation, Barrett understood from this call that Johnson used TT4 to ask if Marsh had "any money available on the peer-to-peer money transfer application Cash App to pay Johnson drug proceeds owed to Johnson." Barrett understood Marsh to say that he did not have funds available on Cash App but that he had cash drug proceeds for Johnson ("I [unintelligible] some for you"), and then Johnson asked where Marsh was in order to arrange to pick up the drug proceeds from Marsh in person. Barrett also states that he knows based on prior interceptions from TT1 that members of

---

[2] According to Barrett, Agents believe based on other calls intercepted over TT1 that "Auntie Jackie" lives in Dodge City and assists Marsh with his DTO. (Barrett Aff. ¶ 29 n.5.)

this DTO, including Marsh, use Cash App to receive and distribute drug proceeds. (*Id.* ¶ 30.)

(11) On February 7, 2023, Marsh received a call on TT1 from Johnson on TT4, during which Johnson asked if Marsh had "some P's, . . . some percs," to which Marsh replied that he did not but "Ryaye" did. Johnson indicated that Ryaye had "just walked through here." He called Ryaye's name while still on the call with Marsh and also told Marsh that he saw Ryaye. Marsh asked Johnson where he was, and Johnson told him, "Right here, right here at the lot, right here." Marsh told him he would "walk over there." (*Id.* ¶ 31.)

(12) Barrett understands this conversation to mean that Johnson used TT4 to ask Marsh if he had some illegally diverted Percocet ("P's" or "percs") and, when Marsh told him that he did not but Ryaye, an unidentified individual, did, Johnson tried to make contact with Ryaye to buy some from him. In addition, Barrett understood that Marsh and Johnson were in close proximity somewhere in Dodge City and that Marsh was going to walk over to the "lot" in Dodge City where Johnson was located. (*Id.* ¶ 32.)

(13) An analysis of phone records for TT4 revealed that, between August 12, 2021[3] and February 13, 2023, TT4 had been used to make or receive 14,618 calls and to send or receive 9,249 text messages and that Johnson had been in frequent contact with numerous Target Subjects of the investigation during that time, including Gerald Cunningham, who was believed to be a source of supply of controlled substances to Jumper, Marsh, and other members of the DTO;[4] Eugene Offutt, who, as discussed in the November 2022 Affidavit submitted in support of the initial wiretap on TT1, was believed to be a cocaine distributor for the DTO; and UM-7001 and other unidentified sources and distributors working with the DTO. (*Id.* ¶ 33.)

The moving defendants argue that these facts are insufficient to establish probable cause to believe that Julius Johnson was using TT4 to commit drug crimes. They assert that the government relies on only four calls from previously authorized wiretaps. Although Johnson was not a party to the two that took place on December 6, 2022 and January 24, 2023, "Ju" was

---

[3] The moving defendants point out that the Indictment alleges that the drug conspiracy began "not later than in or about October 2022" (Doc. No. 4 at 1), meaning, according to the defendants, that the phone records were analyzed for a period of fourteen months "outside of the relevant timeframe of the alleged conspiracy" (Doc. No. 164 at 4).

[4] The Barrett Affidavit details some of the calls intercepted between Cunningham and other Target Subjects, including Marsh and Jumper. (*See* Barrett Aff. ¶ 33(a) n.6.)

discussed. The government interprets "Ju" to mean Julius Johnson. The moving defendants assert that, at most, these two conversations show that "'Ju' may have distributed an unknown quantity of marijuana and what agents interpret to be 'powder cocaine.'" (Doc. No. 164 at 10.) The third call, between Johnson and David Marsh, did not actually involve drugs *per se* but, instead, a discussion about whether Marsh had money in his Cash App account. According to the moving defendants, it is only the government's interpretation of this conversation that associates the discussion of Cash App with the receipt of drug proceeds. (*Id.*) The defendants argue that nothing else in the record supports this conclusion. And the fourth call, in which Johnson asks Marsh if he has any Percocet pills shows, at most, "an attempt to obtain Percocet pills for personal use, not for distribution." (*Id.* at 11.)

The moving defendants further maintain that the government's analysis of the telephone records is speculative at best, particularly given that the four individuals with whom Johnson is alleged to have been in frequent communication are not charged in the Indictment and, moreover, that Johnson's communications with those four individuals make up a very small percentage of his total text messages and phone calls. Specifically, calls between Gerald Cunningham and Johnson make up 5% of Johnson's total calls, and messages between them make up 21% of his total text messages,[5] while communications with the other individuals identified in the Barrett Affidavit make up much smaller percentages. (*See* Doc. No. 164 at 12.) The moving defendants also take issue with the government's failure even to analyze the number of calls between Johnson and Marsh, which, they claim, is striking in light of the government's characterization of the alleged conspiracy as "Marsh's drug trafficking network." (*Id.* (citing Barrett Aff. ¶ 36).)

---

[5] The court observes that 21% is not a small percentage.

The moving defendants argue that the four phone calls and the phone record evidence together fail to "satisfy the statutory and constitutional requirements that probable cause existed" and, therefore, that all interceptions should be suppressed. In response, the government asserts both that probable cause existed and that, in any event, the issue before this court is not whether probable cause existed but, instead, whether Judge Crenshaw had a substantial basis for his finding of probable cause. (Doc. No. 182 at 6.)

The court finds that a substantial basis existed for finding probable cause to believe that Johnson and other targets of the investigation were committing, had committed, or were about to commit drug trafficking offenses and that evidence of those offenses would be intercepted over TT4. Notably, Barrett attested that he was the co-case agent on the investigation of Marsh's DTO and was familiar with the facts and circumstances of the investigation—including the results of the three prior wiretaps. The Affidavit in support of the TT4 wiretap application also incorporated by reference all prior wiretap application affidavits.[6] (*See* Barrett Aff. ¶ 22.) The four calls identified in the Affidavit in support of the wiretap on TT4 strongly imply that "Ju" was a supplier of large quantities of controlled substances and that he was regularly in business with Marsh. The phone records also reflect that he was in frequent communication with other Target Subjects. Based on the totality of these circumstances, it was not unreasonable for Judge Crenshaw to find that probable cause existed both to believe that Johnson was engaged in drug-related crimes and that evidence of that activity would be intercepted over TT4. *Accord United States v. Young*, 847 F.3d 328, 343 (6th Cir. 2017) (finding probable cause in part based on the supporting affidavit's

---

[6] These affidavits refer to evidence establishing Marsh's, Antonio Jumper's, Gerald Cunningham's, and Eugene Offutt's (and others') involvement in the DTO through, for example, controlled buys, consensually recorded phone calls, surveillance, information provided by a confidential human source, and phone records. (*See generally* Doc. No. 184-1 at 22–31; Doc. No. 184-2 at 27–43; Doc. No. 184-3 at 29–37.)

"describ[ing] TT2's toll analysis [as showing] an 'extreme frequency' of calls to and from TT2 over a short period of time, and contact with telephone numbers associated with other known or suspected controlled substance traffickers" and "describ[ing] both of these observations as indicators that the phone is being used to traffic controlled substances").

Moreover, as the government argues, the fact that Johnson *might* have been asking Marsh about Percocet to buy for personal use and *might* have had personal reasons to use Cash App does not mean that Judge Crenshaw was unreasonable in considering both conversations to constitute evidence of drug dealing. As the Sixth Circuit has recognized in rejecting a similar argument that the evidence to which the government pointed in support of probable cause "could have simply involved innocuous family matters, the probable cause requirement does not require that every contrary hypothesis be excluded." *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988). Rather, "[t]he circumstances need only be such as to provide a person of reasonable caution . . . with evidence from which he could find that there was a likelihood that the business of the conspiracy was being furthered." *Id.* In light of prior recorded conversations in which Marsh clearly identified Cash App as a means of payment in drug deals, it was not unreasonable to construe it to mean the same thing here. (*See, e.g.*, Doc. No. 184-2 at 37, January 12, 2023 Barrett Aff. ¶ 37.) Likewise, the reference to Percocet, viewed in light of the relationship between Marsh and Johnson and evidence that Johnson was a supplier of large quantities of marijuana and other drugs, it was reasonable to construe that reference to mean that Johnson was seeking to buy more than a few Percocet for personal use.

The "assessment of the information [contained in a warrant] is largely committed to the issuing magistrate." *Alfano*, 838 F.2d at 163. Under the totality of the circumstances presented to

Judge Crenshaw, the court finds that there was a substantial basis for finding that probable cause existed to support the request for the TT4 wiretap.

### B. Staleness

The moving defendants posit next that, even if the evidence presented to Judge Crenshaw warranted his finding that probable cause existed, the evidence obtained from the wiretap should nonetheless be suppressed because the Barrett Affidavit relied on facts that occurred too far in the past to give rise to a reasonable finding of probable cause. (*See* Doc. No. 164 at 13.) They argue that drugs are "mobile, easily concealed," and "usually sold and consumed in prompt fashion," such that any information related to drug sales is considered to go stale "quickly." (*Id.* (quoting *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010)).)

An affidavit seeking to establish probable cause "may not employ 'stale' information, and whether information is stale depends on the 'inherent nature of the crime.'" *Brooks*, 594 F.3d at 493 (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). The issue here, however, is not a search warrant for drugs—drugs that would almost certainly be moved or sold quickly—but an application for a wiretap, the objectives of which were, among other things, to identify the methods of the distribution of controlled substances by the Target Subjects, discover the identity of those involved in the DTO, identify the hierarchy and structure of the DTO, discover where controlled substances were stored prior to distribution, and find the records related to the DTO. (Barrett Aff. ¶ 34.) The Indictment alleges that the drug conspiracy began no later than October 2022,[7] and information derived from the other wiretaps authorized in the case indicated that it was

---

[7] Barrett's November 2022 Affidavit indicates that the investigation had been going on since early 2022 and that Agents began working with CHS-1 in January 2022 and began conducting controlled buys from Marsh through CHS-1 shortly thereafter. (*See* Doc. No. 184-1 at 25.)

still ongoing. "Evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001); *see also Young*, 847 F.3d at 345 (affirming the district court's denial of a motion to suppress where "[t]he court found that there was a substantial basis to conclude that there was an on-going conspiracy that had been in existence for many years, and thus, the [wire]taps and the reasons therefor[e] are current and not stale" (alterations in original) (internal quotation marks omitted)).

The information at issue here was not stale. This includes calls indicating involvement in drug trafficking that took place within one or two months of the submission of the TT4 wiretap application and phone records indicating that Johnson had exchanged numerous calls and text messages with Target Subjects up through and including the last day for which phone records were analyzed, approximately one month before the TT4 wiretap application was submitted. More importantly, the crime being investigated was an ongoing criminal drug distribution conspiracy of long duration, and the goal of the wiretap was to gain more information about that conspiracy, not merely to obtain evidence of a single drug sale. *Accord United States v. Turner*, No. 3:19-CR-151-TAV-DCP, 2021 WL 2482117, at *5 (E.D. Tenn. June 17, 2021) (noting that "evidence may be deemed non-stale based solely upon the first factor to be considered—the character of the crime— and specifically, whether the character of the crime was an ongoing criminal activity"), *aff'd*, No. 22-5046, 2024 WL 3634454 (6th Cir. Aug. 2, 2024).

### C. Necessity and *Franks*

The moving defendants also contend that the Affidavit failed to establish necessity. The defendants acknowledge that the Barrett Affidavit "outlines the numerous measures available to the federal government for investigative purposes and the reasons why each technique failed in this investigation," but they maintain that the language of the Affidavit is largely "boilerplate and conclusory," without showing the requisite "factual relations to the circumstances at hand." (Doc.

No. 164 at 14, 17–18.) The defendants maintain that the Affidavit shows that the application for a wiretap of TT4 was effectively the "initial step of the investigation" of *Johnson* and that, because it "failed to meet the necessity requirements," suppression is appropriate. (*Id.* at 19.) Alternatively, they assert that a *Franks* hearing is required in order to address purported omissions in the Affidavit that were material to the finding of necessity.

### 1. Necessity

The purpose of the necessity requirement is "to ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Alfano*, 838 F.2d at 163 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). To satisfy the requirement, the government must show that "(1) the wiretap is not the investigation's 'initial step,' (2) traditional techniques would not suffice, and (3) if investigators rely on prior experiences in explaining the inadequacy of traditional techniques, those experiences relate 'to the particular facts of the investigation at hand.'" *United States v. Mosley*, 53 F.4th 947, 953 (6th Cir. 2022) (quoting *United States v. Gardner*, 32 F.4th 504, 515–17 (6th Cir. 2022)). However, the government is "not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. And, again, the judge issuing a wiretap is extended "'considerable' discretion in granting the government's request." *Mosley*, 53 F.4th at 953 (citing *Young*, 847 F.3d at 343).

In this case, Barrett attested, based on his experience and the facts set forth in the Affidavit, that a wiretap on TT4 was "the only available investigative technique that has a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt" that the "Target Subjects" and others were engaged in a drug trafficking conspiracy and other offenses. (Barrett Aff. ¶ 34.) In particular, according to Barrett, although Agents had obtained evidence of various individuals' engagement in drug trafficking activity through the use of various investigative

techniques, Agents had not been able to "accomplish all of the goals of the investigation," including (1) identifying the methods of distribution; (2) discovering the identity of all of the individuals involved in the DTO; (3) identifying the structure and hierarchy of the DTO; (4) discovering where members of the DTO stored or processed the controlled substances prior to distribution; (5) identifying the management and distribution of the proceeds generated by the DTO; and (6) locating any records related to the DTO's illegal activities. (*Id.*)

Barrett identified numerous investigative techniques that are usually employed in this type of investigation and that had already been attempted but had not been fully successful in achieving all of these goals, appeared unlikely to be productive if attempted, or were too risky to use under the circumstances. Specifically, he stated that the Agents involved in the investigation had actually tried or had considered (1) intercepting calls through wiretaps on TT1, TT2, and TT3; (2) conducting physical surveillance; (3) the placement of pole cameras; (4) using confidential human sources; (5) engaging in undercover operations; (6) obtaining consensual recordings; (7) obtaining cellular phone location data ("ping" data") and affixing mobile GPS tracking devices on suspects' vehicles; (8) obtaining telephone subscriber and toll information on TT1, TT2, TT3, and TT4; (9) obtaining search warrants and conducting consensual searches; (10) seeking grand jury subpoenas and grants of immunity to certain witnesses; (11) interviewing target suspects or their known associates; (12) conducting trash searches; and (13) gathering financial information (for example, tax returns, bank statements, credit reports, and real estate records) on the Target Subjects.

For each of these investigative methods, Barrett detailed what efforts to engage in the particular method had already been made and if not, why not; whether and to what extent the method had been successful; and, even if it had been somewhat successful, why it was not sufficient. (*Id.* ¶¶ 37, 39– 75.) Barrett also attested that, in light of the limitations inherent in other

available methods of investigation and the goals of this particular investigation, a wiretap on TT4 was "critical to the effort to learn the full scope of the DTO's drug trafficking operation," particularly given that information obtained from the other wiretaps indicated that Johnson was a higher-level distributor than Marsh, Jumper, or Henry. (*Id.* ¶ 38.)

The defendants argue, essentially, that the Barrett Affidavit consists of conclusory, boilerplate language and that he does not adequately explain why other investigative methods were not tried first. They assert that, as to Johnson, seeking a wiretap on his phone was the initial investigative step, as Agents did not even try to ascertain his residence or to conduct other methods of surveillance on him until after the government obtained authorization to conduct the wiretap.

The court, in short, is not persuaded. First, a wiretap on TT4 was *not* the investigation's initial step. Barrett explains in great detail the investigative methods the government had already used in the case, in addition to the wiretaps on TT1, TT2, and TT3, prior to seeking the TT4 wiretap. He also explained—exhaustively, over the course of twenty of the forty-one pages of the Affidavit—the usefulness of these methods as well as why they were not sufficient and why the TT4 wiretap was necessary.

Just as one example, Johnson explained based on his "training and experience" that physical surveillance alone "rarely succeeds in gathering evidence of the criminal activities under investigation"—largely because "drug transactions often occur out of public view." (Barrett Aff. ¶ 39.) Thus, he explained, surveillance is most useful to confirm meetings among alleged participants in criminal activity but "often leaves investigators with insufficient evidence to prove the purpose to the meetings and other activity." (*Id.*) When physical surveillance is used in conjunction with court-authorized wiretaps, however, "the purpose of meetings takes on a new significance and may constitute admissible, persuasive evidence of criminal activity." (*Id.*) He also

explained that physical surveillance—other than surveillance of controlled purchases made by CHS-1 and limited aerial surveillance—had been used sparingly thus far in the investigation, both for safety reasons and to avoid detection of the investigation by the Target Subjects. (*Id.* ¶ 40.) He stated that surveillance inside Dodge City is difficult and that surveillance set up at a restaurant members of the DTO are known to frequent had not yielded any useful evidence. (*Id.* ¶ 41.) He noted that calls had been intercepted that indicated that Target Subjects had identified surveillance vehicles around Dodge City when they had been attempted to be used, forcing surveillance to be terminated. (*Id.*)

Barrett also explained that surveillance on Johnson had not been attempted and that the requested wiretap on TT4, along with cellphone location information on the same phone, would assist Agents in verifying whether an address they had identified as associated with Johnson, but at which he had not yet been observed, was actually his residence. (*Id.* ¶ 43.)

Barrett engages in a comparable analysis with respect to other traditional methods of investigation, explaining why the use of pole cameras, confidential human sources, consensual recordings, telephone location data and phone records, and trash searches had been of limited utility and why, at this point in the investigation, other methods of investigation, such as undercover operations, search warrants, grand jury subpoenas and grants of immunity, and interviews of Target Subjects, would either be of limited use or would harm the investigation.

In other words, Barrett more than adequately described why traditional investigation techniques would not suffice in this case, and he explained the inadequacy of these techniques with reference to "the particular facts of the investigation at hand." *Mosley*, 53 F.4th at 953. As the Sixth Circuit has found under similar circumstances, "if *this* affidavit were found insufficient, it is unlikely that any affidavit would be sufficient to prove necessity for a wiretap." *United States*

*v. Cooper*, 893 F.3d 840, 844 (6th Cir. 2018). Judge Crenshaw clearly did not abuse his discretion in finding the necessity requirement met here.

### 2. *A Franks hearing is not required*

A defendant is entitled to a *Franks* hearing if he "(1) can make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement or material omission in the affidavit; and (2) proves that the false statement or material omission was necessary to the finding of probable cause." *Cooper*, 893 F.3d at 844 (citing *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013)).

A defendant who attacks a judge's determination of probable cause by "challeng[ing] the veracity of statements made in [the] affidavit that formed the basis for [the] warrant has a heavy burden." *United States v. Asker*, 676 F. App'x 447, 456 (6th Cir. 2017) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). He must make "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). The "burden is even greater where, as here, the defendant alleges that the affiant intentionally omitted material information from the affidavit." *Id.* To proceed under these circumstances, the defendants here must make a "strong preliminary showing" that Barrett "excluded critical information from the affidavit" with the intent to mislead the reviewing judge. *Id.* at 816. And even if they make that showing, suppression will not be necessary if, "absent the challenged statements, there remains sufficient content in the affidavit to support a finding of probable cause." *Id.* (quoting *Bennett*, 905 F.2d at 934).

The moving defendants argue that the Barrett Affidavit establishes that no physical surveillance of Johnson was attempted prior to obtaining the wiretap authorization on TT4, but, after the wiretap was authorized, the government began conducting surveillance on Johnson. Accordingly, the defendants say, "the affidavit fails to provide a 'full and complete statement' as

to why physical surveillance had been tried and failed or why it was unlikely to succeed," particularly in light of the undisputed fact that the government had only identified Johnson as a suspect "a few days prior to seeking the wiretap authorization" and "apparently had no issues surveilling other individuals of the alleged conspiracy, despite the fact that those individuals were operating in the same 'close-knit community' that somehow led agents to believe surveillance on Johnson would be impossible." (Doc. No. 164 at 16.) In fact, Barrett explained why surveillance did pose significant issues, though it had been tried with limited success prior to the submission of the TT4 application, and he never stated that surveillance on Johnson would be impossible—just that it would be more likely to yield substantial evidence if used in conjunction with a wiretap. (*See* Barrett Aff. ¶¶ 39–47.)

Similarly, the defendants maintain that the Affidavit fails to adequately explain why trash searches at Johnson's residence (or two identified residences) were not conducted. But the Affidavit does describe the trash searches already conducted, explaining that they had provided some evidence of drug packaging and distribution within the residences where trash was searched but without revealing "who is engaged in this activity" or "the type and quantity of controlled substances involved." (Barrett Aff. ¶ 71.) Barrett explained that, while "additional trash searches may produce usable evidence," they also posed the risk of compromising the investigation. (*Id.* ¶ 72.) He noted that, during one trash pull, Agents had observed security cameras mounted on the residence pointing in the direction of the trash cans, and he believed that asking sanitation department employees for assistance was not realistic, as there was always the risk that such employees might notify the Target Subjects and prematurely expose the existence of the investigation. (*Id.* ¶ 70.)

The moving defendants have failed to make a substantial preliminary showing that the Barrett Affidavit intentionally omitted any material facts, and they have not identified any particular omission that would have had any impact on the court's necessity determination. Moreover, the "omissions" to which the defendants refer are not actually factual omissions but, instead, "simply allegations of agents' failure to take certain investigative steps in relation to Julius Johnson." (Doc. No. 182 at 18.) For example, the defendants are not arguing that the Affidavit omits information about anything that actually occurred that would have made a difference to the probable cause (or necessity) determination. Nor do they contend that the Affidavit omitted information, or contained misleading statements, regarding methods that had or had not been tried yet in the investigation. The defendants' actual argument is that the Affidavit did not adequately explain why various investigative techniques had not been tried at all with respect to Johnson. As set forth above, however, the government is "not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. The court has already rejected the defendants' necessity argument, and they have not shown that they are entitled to a *Franks* hearing based on purported omissions from the Barrett Affidavit.

The moving defendants also contend that material misrepresentations (or "disputed facts") establish that a *Franks* hearing is necessary. The court finds that the defendants have not made the necessary showing of a false statement that was material to the probable cause determination. First, the defendants contend that a *Franks* hearing is required to challenge Barrett's statement that, before his arrest and "deactivation" in January 2023, CHS-1 told Agents that Johnson was "known within the North Nashville community as a high-level drug trafficker," but CHS-1 "did not have access to Johnson or specific information about Johnson's drug-trafficking operation." (*See* Barrett

Aff. ¶ 48.) The defendants contend that they have not been able to locate evidence that CHS-1 made this statement within the discovery produced by the government. (Doc. No. 164 at 17 ("If such statement was made by CHS-1, Defendants have been unable to locate it in discovery. A *Franks* hearing is warranted on this issue.").) This statement, however, does not qualify as a misrepresentation that had an effect on the probable cause or necessity determination.

The moving defendants also take issue with Barrett's purported statement in his March 10, 2023 Affidavit that Johnson had "been identified since February 16, 2023." (*See* Barrett Aff. ¶ 21.) The defendants appear to contend that that statement is false, because the record establishes that Johnson was not positively identified as a Target Subject until February 27, 2023, at the earliest, as that was the day the "AT&T subpoena return was created . . . and identified Julius Johnson as the subscriber of phone number (615) 973-3220 and his user name as 'Big Ju.'" (Doc. No. 164 at 20.) In addition, the defendants assert that the government's sealed Fifteen-Day Report on the initial interception on TT3, filed on March 6, 2023, represents the first time the government identified "Ju" as Julius Johnson in any court filing.

The court agrees with the government that the moving defendants have misread the Barrett Affidavit as stating that Johnson was identified *on* (or by, or before) February 16, 2023. In the paragraph preceding the language to which the defendants object, the Affidavit states that Judge Crenshaw signed the Order authorizing the TT2 wiretap on February 16, 2023. The Affidavit then states in relevant part:

> Information for the Target Subjects . . . is set forth in the affidavits submitted in support of the authorization granted in this Court's November 28 Order, January 12 Order, and February 16 Order, which are incorporated herein. The following [additional] Target Subjects *have been identified since February 16, 2023*. . . . Julius Johnson [and] Archie Leniel Henry . . . .

(Barrett Aff. ¶ 21(a) & (b) (emphasis added).) Read in context, Paragraph 21 of the Affidavit can only reasonably be understood to mean that both Johnson and Henry were identified by the

government as Target Suspects *after* the February 16 Order was entered, not that they were identified on or by or before February 16. This statement does not qualify as an intentionally or recklessly false statement that would entitle the defendants to a *Franks* hearing.

### D. The Sealing Requirements of 18 U.S.C. § 2518(8)(a)

Section 2518(8)(a) states in relevant part that intercepted communications should, if possible, be recorded in such a way as to protect them from alterations and that, "[i]mmediately upon the expiration of the period of the [wiretap] order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." *Id.* The Sixth Circuit recognizes that "immediately" means "within one or two days." *Cooper*, 893 F.3d at 845 (quoting *United States v. Wilkinson*, 53 F.3d 757, 759 (6th Cir. 1995)). "If a recording is not sealed 'immediately,' the government must provide a 'satisfactory explanation' for why it was not, in order for the recording to be admissible." *Id.* (quoting *Wilkinson*, 53 F.3d at 759).

The record in this case reflects that the initial Order authorizing the thirty-day wiretap on TT4 was entered on March 9, 2023 and extended through April 8, 2023. (*See* Doc. No. 164-2.) On April 7, 2023, Judge Crenshaw entered an Order extending the authorization for an additional thirty days "measured from the date of [that] Order," or through May 7, 2023. (*See* Doc. No. 184-4 at 5.) The government filed an Application to Seal the recordings of intercepted communications occurring between March 10, 2023 and April 8, 2023 on April 13, 2023, before the expiration of the extended authorization. Application, *In Re No. (615) 810-7821* (M.D. Tenn. April 13, 2023), ECF No. 35. The government explained in the Application that Special Agent Timothy Finney had informed the Assistant U.S. Attorney on the case that the target communications had been "burned" to "two discs on April 10, 2023 and mailed to DEA's office in Nashville via Federal Express. Special Agent Finney received the discs on April 12, 2023." *Id.* ¶ 6(b). The court granted

the Application the same day. Order, *In Re No. (615) 810-7821* (M.D. Tenn. April 13, 2023), ECF No. 36.

The government submitted its Application to seal one disc containing the recorded interceptions of communications that occurred between April 7, 2023 and April 25, 2023 on May 2, 2023, which the court granted on May 4, 2023. Application, *In Re No. (615) 810-7821* (M.D. Tenn. May 2, 2023), ECF No. 38. The government explained that, although the TT4 wiretap authorization extended through May 7, 2023, Johnson stopped placing outgoing calls on TT4 on April 25, 2023, "leading agents to believe that Johnson was no longer using the phone." *Id.* ¶ 6(b). Once the Agents verified that the phone was no longer being used, the intercepted communications were recorded on a single disc on May 1, 2023, which Special Agent Finney received on May 2, 2023. Finney was out of the office traveling for work the week of April 24, 2023 and was "thus unavailable to receive the disc and make it available to the Court for sealing" prior to May 2, 2023. *Id.* ¶ 6(c). The court granted the Application and entered the Order sealing the recording on May 4, 2023. Order, *In Re No. (615) 810-7821* (M.D. Tenn. April 13, 2023), ECF No. 39.

Although the submission of the Application to seal the first thirty days of communications on April 13 did not occur "immediately" after the expiration of the initial authorization order, it occurred within the period covered by the extension of the authorization, and the government adequately explained the delay. Likewise, regarding the second Application, Johnson, "of course, did not advise the government that he had stopped using [TT4]." *Cooper*, 893 F.3d at 845. And the government explains that Agent Finney was out of town and unavailable the week of April 24, 2023. He also had no apparent reason to anticipate that Johnson would stop using TT4. Immediately upon his return, however, and nearly a week before the expiration date on the face of

the extended authorization, the government submitted the TT4 recording for sealing. As in *Cooper*, the court finds that "[t]his satisfies the 'immediately' requirement of § 2518(8)(a)." *Id.*[8]

Even if the Application somehow does not qualify as "immediate," the government has adequately explained the delay, and the delay is not "so extreme, nor the explanation insufficient, to require suppression." *United States v. Reed*, 575 F.3d 900, 914 (9th Cir. 2009).

## IV.   CONCLUSION

For the reasons stated herein, the moving defendants' Motion to Suppress Evidence Obtained Pursuant to Unlawful Wiretap (TT4) (Doc. No. 164) will be denied. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

---

[8] Notably, the government cannot be faulted for the two-day delay between the court's receipt of the Application and entry of the Order to Seal, as its obligation was to make the recording "available to the judge issuing such order." 18 U.S.C. § 2518(8)(a); *accord United States v. Reed*, 575 F.3d 900, 913 (9th Cir. 2009).